May it please the Court, Richard Kendall on behalf of the defendants in Appalachia. The first issue on this appeal is whether the California Anti-Slap Statute applies to DC Comics' state law claims. They allege that Mr. Toborow induced and assisted the heirs of the Superman authors to breach their agreements and instead to pursue their termination rights. These claims of breach, of disruption, and damage all flow from the heirs' very efforts to terminate DC's copyrights. If you delete those allegations from this complaint, there would be no claim. There would be no harm, there would be no breach, there would be no interference because there would be no breach. The Anti-Slap Law therefore covers the conduct that is alleged and the District Court was wrong to fail to appreciate that this is protected activity. The policy of the Anti-Slap Statute is to prevent defendants who have bottomless pockets from bankrupting, from litigating to the death a plaintiff who simply wants to pursue her government-driven rights. And what's happened here is that two years and six months into this litigation, we are still litigating a case that has never addressed the lack of merit because of the very clear affirmative defense of statute of limitations and very clear affirmative defense of litigation privilege and other defenses as well that this Court de novo, as a matter of law, and the District Court should, as a matter of law, have determined, have left this case with no merit. The argument that is made by the other side is, no, no, no, this case is not about pursuing termination rights. But I ask the Court, if you took out all of the places in the complaint and there are many where the termination rights pursuit by these heirs is referenced, what would be left? Why would we be here? Do we think that Warner Brothers and the subsidiary DC Comics has brought year upon year of litigation, in this case, in the case you're about to hear in Siegel, simply because they're fine with termination? No. The whole issue here is whether the heirs can terminate their rights. And it is Mr. Tovaroff's assistance, inducement, whatever they want to allege that it is, that they're complaining about, but only because it resulted in first the Schuster heirs and later the Siegel heirs deciding they did not want to accept what DC was offering. Instead, they wanted to pursue the rights that Congress enacted for them to level the playing field. The fourth claim, which is the claim that DC alleges that Mr. Tovaroff interfered with the 1992 contract, alleges a breach of a contract that they claim means that the Schuster heirs had given away their termination rights in 1992 and therefore were not allowed to pursue termination when they met up with Mr. Tovaroff. Mr. Tovaroff provided financial assistance and legal assistance to enable them to pursue those rights. The pursuit of those rights, as in the Mindy Cosmetics case, which is a trademark case, and as in all the other cases that we cited where there is an effort by a litigant to pursue rights either through settlement or through litigation, that's protected activity. Strip that protected activity out, as I've said, and there's no case left. The only breach, the only possible breach that was induced here, the only possible disruption that could be claimed here of the 1992 agreement is the pursuit of termination rights. As a matter of law, their argument is wrong, but there's no question in addition to that that it's protected activity. Now move on to the fifth claim. That's the claim as to the Seagulls had been arguing with D.C. about the termination that they had filed in 1997 from 1997 until 2002 for all that period of time without Mr. Tovaroff being involved at all. All of those arguments, all of their dealings with D.C. occurred against the backdrop of threatened litigation because when the Seagulls had in 1997 terminated, they were immediately met with a threat by D.C. to go after them to invalidate their termination. And there was a tolling agreement in 1999, again showing that this was a matter that was inevitably going to go to litigation if they didn't settle. The complaint that is made is that after the Seagulls had rejected the long-form settlement agreement that was proposed and, of course, you'll be hearing more about this in the companion appeal, and after they'd gone off looking for replacement counsel, as it says in the record, they were searching for counsel even in March of 2002. They had gone after Jerry Spence to see whether Jerry Spence would represent them. There was very angry correspondence written by the very elderly Mrs. Seagull, who, unfortunately, is not with us today because this endless battle had finally ended with her dying before she could see the end of it. And what happens then is that they allege that Mr. Tovaroff, in the fall of 2002, in late summer, induces the Seagulls not to do something better. That is protected activity. Solicitation of a client is protected activity. We cited cases on that proposition. The leading one is the Tahiri Group case. Funding litigation is protected activity. Engaging in settlement discussions is protected activity. And all of these challenged activities, in addition to being protected, are barred by the statute of limitations. The three-year statute of limitations is the one that governs the fourth and fifth claims for interference. Now, it is clear on the face of the pleadings, and it is certainly clear in the record, that in 2006, at the very latest, D.C. was on inquiry notice of all of its claims in the fourth and the fifth claims for relief. The fourth claim, D.C. received in discovery in 2006, the agreements between the Tovaroff corporate entities, Specific Pictures, and the Schuster heirs that allegedly interfered with D.C.'s rights. They had what they're complaining about in 2006. They did not bring this case until May of 2010. They sat on that. Why did they sit on that? Well, we can only speculate, but it may have had something to do with Judge Larson's summary judgment decision in the companion case you're about to hear and their desire to keep this litigation going as long as they could to have something else to do to make it difficult for the Siegel case. The statute of limitations, as far as their case, have you made a motion to dismiss on the basis of summary judgment, on the basis of the statute of limitations? Well, that was part of our anti-slap motion, Your Honor. And the anti-slap statute works like a reversal. Why do you even need an anti-slap motion if you've got a clear basis for dismissal or judgment on the statute of limitations? Because we could do that, Your Honor. And, in fact, we had a motion to dismiss that was pending. But the anti-slap statute is supposed to go quickly, and it's supposed to go first. And, in fact, although the State court rule does not bind the Federal court, you know, in State court it's 90 days, it has to be decided. We expected that this would move much more quickly. And then after this, the district court denied the anti-slap statute, there is case law that says that all matters on the merits should then be brought to a halt while the immunity that's supposed to be conferred by anti-slap goes up on appeal. Again, in the State court, the appeal acts as an automatic stay in the Federal courts as in the qualified immunity cases. When there's a denial of qualified immunity, that brings to a halt the merits reviews. And also we had a desire to, since we fully recognize these issues, we're going to all end up going up on appeal because that's the nature of this litigation, not to have piecemeal appeals. But let me just see if I understand him. If you were unsuccessful with your arguments about the anti-slap statute, then this would go back to the Court and you feel you would win on the statute of limitations grounds, at least as to the Fourth and Fifth claims. We believe that that's what should happen, but we do not believe we should have to wait for that to happen, Your Honor, because the policy of the anti-slap statute is to bring the matter to an end. And in this case, unlike the last case where Judge Thomas was asking the district court didn't decide that issue, should we remand to the district court, here we have a de novo issue that should be decided by this court in the first instance, and in fact, that is routinely what happens in the courts, the California courts and the Federal courts. So even though the district court has not decided the matter, we cited a Fifth Circuit case to the court, Henry v. Lake Charles American Press, in which this court, a court of appeal, owing to the fact that it's a de novo issue, there's no need to have any more discovery, there's no need for anything other than a resolution of the very simple question on both the fourth claim and the fifth claim and also the sixth claim, that owing to when it is indisputable that D.C. had all the information necessary to know it had a claim, maybe not all the facts have piled up since, but that's not the issue because the claim accrues when you're on inquiry notice. So are you saying, then, that we could simply rule in your favor based on the statute of limitations, that this court could do that? Yes, absolutely. There's no question whatsoever about that. You could also do it on the basis of other pure issues of law that are presented here, including the litigation privilege and, with respect to the 1992 agreement, the misreading as a matter of law of the copyright statute. But you needn't go to those other issues because the statute of limitations disposes of all of the claims here. The sixth claim as well as the fourth claim? The sixth claim, now, there is some vagueness in the pleading. There are potentially three agreements at issue in the sixth claim. Now, first of all, the sixth claim is a four-year statute of limitations, but under the unfair competition law in California, that's – there is no discovery rule whatsoever. So with respect to the claims in the sixth claim relating to the 2001 and 2003 agreements between the Schusters and the Toberoff entities, those claims accrued no later than 2003, and they had expired by 2007. They were long gone when this case was filed. There's also a claim relating to the 2008 so-called consent agreement, which is the or what the magistrate described as the sort of Koufax-Drysdale collective negotiation agreement. The argument that is made is that that agreement is somehow unlawful under the copyright statute because of the way that the termination windows work.  There's no question that they have misread Section 304C6D. You don't need to dig into the record at all to determine that that provision did not give D.C. any exclusive and enforceable right that would have prohibited the Schuster and Siegel families from banding together and decide that neither one would settle without the other. The statute does no such thing. The statute doesn't compel the terminating parties to negotiate with the terminated grantee here at D.C. Comics, and it doesn't forbid those terminating parties from negotiating with anyone else. All it requires is that before the Schusters and the Siegels could have actually consent agreements, they couldn't transfer the copyright. But banding together, there's absolutely nothing in the copyright statute that prevents that. As to that, though, even if the Court didn't want to reach that pure issue of law, it's also clearly litigation privileged for the two families to band together for purposes of a mediation, which is what they did, and for the ongoing purposes of these litigations, which they've done. Your Honor, I'm seeing that I'm just about out of time. If I can reserve at least a minute or two for rebuttal. We'll give you a minute or two. Thank you very much. Good morning, Your Honors. May it please the Court. My name is Matt Klein. I represent D.C. Comics. The SLAPP statute does not apply here for one simple reason. The focus of California law in analyzing a SLAPP claim is whether the claim at issue targets is based on or arises out of protected activity. I'd like to walk you through the three claims here. The fifth claim is based on the following allegation. Mark Toberoff makes a false representation to the Siegel heirs in August of 2002 that he has a $15 million hard offer in hand from a billionaire investor. And if the Siegels take that offer, they can sell their rights to him and his company, Mark Toberoff, Ari Emanuel, a business agent, and IPW Worldwide, and this unnamed investor. That was not the solicitation of a legal client. That was not a request that litigation be initiated. That was not done in the context of litigation. There was no litigation between the Siegels and D.C. They had an existing contractual relationship. And Mr. Kendall says to you, please, read out from the complaint all of the later conduct, all the later litigation, all the later settlement. Please do so. How were we harmed when that happened? How was D.C. harmed in 2002 when that happened? Well, for one, it had paid $250,000 to the Siegels as a good faith advance payment in connection with that settlement agreement. That $250,000 was gone. And what have we learned from the California cases about whether that's protected activity or not? The cases of Hainline and Newport Builders are directly on point. Newport Builders holds that if two parties are in a settlement conference and there the defendant was a former party to that litigation, the defendant shows up at their two-party settlement conference and makes fraudulent business offers, actually to both parties, trying to get one of them to sell him valuable rights. He later is sued for those fraudulent business offers, and he's even injected an actual court-appointed settlement process. The California Court of Appeal holds that that intervention in that settlement process is not protected by SLAP or the litigation privilege. Why is that? Because we don't want people intruding on these types of processes and then using the cloak of the litigation privilege or even their role as a lawyer, as Mr. Tobaroff has done, to say that that conduct is not protected. And to be very clear, if you look at the offer that he's made, and it's testified to in Mr. Marks' deposition and the Marks memo that we've asked you to review in connection with this appeal, he's not saying to them, please hire me as a lawyer. He's saying, please sell me your rights for $15 million. And under the clear case law, Hainline is another classic example. You have a buyer and a seller. The seller is about to sell a valuable piece of property to the buyer. A third party comes along and says, hey, don't sell that property to the buyer. Let's go out and initiate some litigation. In fact, I have a lawyer here. Please come hire my lawyer, and we'll go out and we'll file a lawsuit, and our rights will become much more valuable and we can find another buyer. That's the Hainline case. And they say in their appeal, well, hold on a second, D.C., you haven't been harmed. Again, let's look at the fourth claim, the Schuster claims. We had been paying the Schusters $600,000 over the course of years. We would have been damaged had Mark Toberoff never filed a termination notice. We would have been damaged had they never initiated litigation. And to be clear, the Schusters never did initiate litigation. And what does the Hainline case say? The Hainline case says you can get the difference in a tortious interference case like this where somebody says, hey, don't honor your existing deal. Come with me. Initiate litigation. What does the Hainline case say? It says two things. Number one, you can recover the delta between the original contract you had and this new contract you had to go out and enforce. There is $425,000. And it says a second very important thing. It said you can also get as consequential damages in that case, the attorney's fees that you spent having to pursue your rights. And Mr. Kendall urges you, he says, read out all of the so-called protected activity, the probate action that they filed, none of which we've ever accused Mr. Tobroff is the basis for our fourth, fifth, or sixth claims. He says, read all that out. That's fine. Under the well-established California case law, we prevail in this case. And they say, well, hold on a second. You do seek attorney's fees and costs as one form of damages, and you can't do that under California law. Well, the Cozen-O'Connor case, 192 Calat 4, 1392 says, and I quote, the remedy sought does not affect whether the claim is based on protected activity. The Marlin case says the exact same. And their South Sutter case says the exact same. And why is that? Because California has a special pleading doctrine called the primary right of action. And the remedies you seek do not affect what the primary right is. And here under the fourth claim, I'm sorry, under the fifth claim, we are suing Mr. Tobroff for this fraudulent business offer. And discovery in the case has proven this fraudulent business offer occurred. It has proven that there's no billionaire investor. It has proven that there was no $15 million. And looking at the fourth claim, for example, they say SLAP applies because in this joint venture agreement in which Mr. Tobroff made the choice, I don't only want to serve as your lawyer. I want you to give me 50 percent of your copyrights. They say the litigation privilege should apply. They say that SLAP should apply because down the road he actually, in fact, did act as their lawyer. Well, that's not what the case law holds. The case law holds that when you have an admittedly illegal contract, this is their own case. This is the Huntington Life Sciences case. That case holds when you have an admittedly illegal act, when the conduct complained of was illegal, then as a matter of law, the defendant cannot make a prima facie showing that SLAP applies. Now, where do we have those admissions in this record? You have Mark Peary, one of the defendants in this case, one of the signatories to the PPC agreements. He testifies under oath that Mark Tobroff told him, this is at SER 512, the Pacific Picture Agreements were illegal. In their first filings in this case, defense counsel and defendants admitted this is a – and I'm flip-flopping these. Peary admission is at SER 322. The defendant's admissions and briefing is at SER 512. They admit that those Pacific Pictures Agreements were unlawful. Again, under their own case, Huntington Life Science, SLAP may not apply when there's an admission that the act complained of is illegal. The Flatley case also says that. And why is that? I'd like to give you an example. If I came to you, if all of my friends and I decided we wanted to go out and vote tomorrow, and I came to you, and we didn't have a way to get to the polling station. If I came to you and I said, I have this special set of magic beans I want to sell you, and it's going to make you rich. And if you trade me your car and I give you these magic beans, will you do that? You do that. I then go out and I take the car and I take all these people to go vote. And clearly my purpose in getting the car was I wanted to get out to vote tomorrow, a very important protective right. That wouldn't stop any one of you from suing me for defrauding you of your car. And that's why the California courts focus like a laser on what is the protective conduct being challenged here. And in each one of our causes of action, we are focused on admittedly illegal conduct. Mr. Kendall ascribes all sorts of negative motives to D.C. Comics, but Cotati holds very clearly, as does in re-Episcopal churches, our motives are irrelevant. Our motives were also pure. The district court has held, based on their own admissions, that their contracts were illegal. Mr. Toberoff told us this Toberoff timeline document is a pack of lies. One evidentiary ruling after another has confirmed that he made the $15 million bogus billionaire investor fraudulent statements to induce the Seagulls to do business with him. Now, as to the prong two questions, this is whether there's minimal merit to our claims, the statute of limitations issues, you don't need to reach those questions because we went on prong one. And you don't get to prong two unless we do not prevail on prong one. And, again, it's their burden on prong one. On prong two, the burdens are split. To show that there's minimal merit to our claims affirmatively, it's our burden. For them to prove the viability of their affirmative defenses, their Peregrine case holds that it's their burden. And here we have a very open factual issue. You asked, why didn't they get their statute of limitations issue ruled on below? The district court issued a ruling saying, I will rule shortly on your Rule 12 motions. These Rule 12 motions raise the statute of limitations arguments, the litigation privilege arguments. Apparently afraid that the ruling wasn't going to come out their way, they withdrew the motion. They have never filed a Rule 56 motion in the intervening years. And most importantly, most importantly to this Court, if it's going to look at the second prong of the slap test, we have a pending Rule 56D motion, which under this Court's Garrett decisions, we said we need more discovery, including on the litigation privilege. And if you look at the Edwards case, if you look at the Mindy's case, if you look at the Bilan case, that's a highly fact-bound inquiry. And what they're saying is, well, everything we did, we did with the intent to litigate. Not so. The documents that have come out, the Toberoff timeline documents, the deposition admissions show that between 2002, when the fraud occurs, and 2004, Mr. Toberoff and Laura Siegel never entered into a litigation agreement. The record that has emerged in discovery has shown that between 2001, when Mr. Puri and Mr. Toberoff signed their business joint venture, and 2010, no litigation is initiated. And so we told the district court, on each one of these defenses, on each one of these contested fact issues, we need further discovery. And because the district court ruled in our favor in prong one, he never had the opportunity to exercise his discretion, whether to permit further discovery, to confront their statute of limitations and litigation privilege arguments. And to me, the key case on the statute of limitations issues, there's really two. One is Judge Thomas's opinion in the Living Designs v. DuPont case. This is a fungicide case out of Hawaii from the 1990s. And the issue there was whether fraudulent concealment of evidence trumped the inquiry notice rules. And the answer there was yes, because DuPont had made false representations to opposing counsel to obtain a settlement agreement. And here we have the exact same thing. If you look at Mr. Toberoff's representations in the district court about whether the Toberoff timeline was accurate or not, he called it a worthless piece of garbage. He called it an accurate hit piece. He called it a pack of lies. He actually chastised counsel for relying on that document and filing this lawsuit and pursuing discovery. One discovery ruling in this case after another, exactly as in Your Honor's DuPont case, has proven those representations to be absolutely false. And each one of those false representations has told the running of the statute of limitations. That's an intensely fact-bound issue, as Your Honor recognized in that case, that cannot be decided on the cold record here and cannot be decided before the district court in its own discretion evaluates whether further discovery is warranted under Rule 5016. Moreover, the consent agreement, as Mr. Kendall conceded, is well within the statutory period. And what Mr. Kendall did not tell you is that there's a pending discovery motion to obtain a copy of the consent agreement, or that Judge Wright in his ruling last week and a couple weeks ago in the summary judgment ruling invalidated all of their consent agreements, the earlier PPC ones and the later consent agreement. And so it's D.C. Comics' submission that this case must fail and the district court's ruling must be affirmed because defendants have come nowhere close to meeting their burden on prong one to prove that the slab statute applies. When you actually look at, as the courts require, what conduct we're challenging, this is not protected activity. And what is the best example of this? The best example of this is the long line of cases in California courts, including the Robles case, including the – and I apologize, Your Honors – including the Aguilar case, including the Baharian-Meier case, where it's actually conduct in the litigation itself that's being challenged. In the Robles case, it was an expert witness testifying during his deposition. And the litigants, as here, said, well, hold on a second. You're challenging his classically protected speech. He's giving a deposition answer as an expert in a case. You can't possibly sue him. And the court dug under that and said, hold on a second. They're not suing him for giving a deposition answer. They're suing him for negligence and a failure to disclose conflicts of interest in connection with that testimony. The two are separate and distinct. A similar case is the Baharian-Meier case. There, you had officers and directors who chose outside counsel to initiate litigation on behalf of the company. And the shareholders sue, questioning that decision. And as here, the defendants say, hold on a second. This is a litigation choice. We're choosing our lawyers. We're choosing litigation strategies. How dare you sue us? And the court said, hold on a second. That's not what you're being sued for. You're being sued for corporate waste. And this is a pattern of practice consistent with those acts of corporate waste. And if you look at the Episcopal Church case, there, the complaint is littered with references to the very serious ecclesiastical dispute between a local parish and the national parish concerning gay marriage. And the court said, you know what? We understand that. We understand that that's a big political issue. We understand that's the reason why you're all fighting. But guess what? This is a property case. And so the slap doesn't apply. And perhaps the most important case to take a look at is the Cotati case. In the Cotati case, a group of mobile home owners challenge a new city regulation governing their homes in federal court. The city runs right out and files for declaratory relief in state court, admittedly trying to gain a tactical advantage against the other side. California Supreme Court held, we understand that the city's complaint referenced page and chapter and verse, the Fett-Prowl federal court case. But what's really going on here? The city ordinance is being challenged. That's the issue of controversy. That's what the complaint is really challenging. And it's the same thing here, Your Honors. It's illegal rights-tying agreements that we're challenging. It's acts of interference through fraud that cases like Hainline, Newport Builders, and a long line of cases say are not protected by a slap. And all of these – and I'd especially encourage you to read Judge Fletcher's opinion in the Mindy's case. If you ever get to the second part of the test, Mindy's holds slap may apply to certain conduct, but the litigation privilege, that's the much tougher bar. It didn't apply to the trademark registration filings here. Read the Edwards case. It's the seminal case in California talking about the litigation privilege. It has absolutely no application to acts of fraud two years prior to litigation. Or illegal business agreements 10 years prior. I see my time is up. Over, Your Honor. I'll sit down. Thank you. Thank you, counsel. All of the cases that Mr. Klein just referred you to are cases in which the essential elements of the claim of damage were satisfied by unprotected activity. The difference between this case and all of those cases is that there is no damage here other than the damage from protected activity. And the protected activity is the pursuit of termination rights. I call the Court's attention to the damage allegation in the complaint, which is paragraph 186, which says, As a result of Tovaroff's misdeeds, the Siegel heirs repudiated the D.C. Comics agreement and ended all further discussions, causing D.C. Comics to lose the value of the agreement, to lose their ongoing business relation with the Siegels, and incur subsequent legal fees and legal disputes. All of that results from the pursuit of termination. Similar allegation as to what happened as a result of the alleged interference with the Schuster agreement. It is all because of the pursuit of the termination rights. And that's why all of these cases are distinguishable. One other point. The argument that is made that the PPC-Schuster agreements were illegal and therefore not within SLAPP is just completely wrong. The cases they cite involve criminal conduct, and criminal conduct is not protected under the SLAPP statute. Extortion is not protected. Hate speech is not protected. But there was nothing actually illegal about the agreements that were made between Mr. Tovaroff and the Schusters. It's just that they are unenforceable because of the operation of the copyright law window. They're unenforceable. They are not illegal. There is no public policy whatsoever that would say that the anti-SLAPP statute doesn't apply on account of those agreements. Thank you very much, Your Honor. Thank you, counsel. The case just argued will be submitted.
judges: Sedwick, Reinhardt, Thomas